The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this honorable court. Good morning. Our first case for argument today is 21-1070, Novartis Pharmaceuticals v. Accord Healthcare. Mr. Stearman, please proceed. Thank you, Your Honor, and may it please the court. Both of the written description failures that are on appeal are directed to dose limitations of the asserted claim. And the reason is that the 405 patent does not disclose an invention directed to fingolimod dosing as the inventors were not in possession of such an invention by their own admission. In addition to the inventor's own admissions, the patent itself in the very setup to the only two places that all parties agree matter from the patent specification, which does not begin until column 10 with the description of the EAE experiments and the investigation of clinical benefit. Even those portions of the specification are introduced in column 10, line 25 as a description of the utility of the S1P receptor modulators can be illustrated in the following animal tests and investigation of clinical benefit. And that's precisely what this patent, the 405 patent, was directed to, directed to establishing the utility of a broad class of compounds called S1P receptor modulators. And it was not a patent directed to disclosing an invention about any particular dosing of S1P modulators in general or fingolimod specifically. What do we do, counsel, what do we do about the fact that the district court found that the prophetic application was all about coming up with the lowest possible human dosage based on the lowest dosage available from the animal studies? Right, so with respect to that argument that goes to the argument about this 0.5 milligram claim limitation, the response is that the district court did not cite any evidence either from the patent itself or expert testimony that links the description of the rat EAE experiments with the investigation of clinical benefit that follows those. There is no discussion in the patent at all about how rat dosing would apply to human, rat dosing in an EAE model would apply to human dosing for the treatment of RRMS. That is not in the patent and all of the experts that testified agreed that that is not in the patent. And in addition to there not being any explanation whatsoever about how to translate or use the rat data for the purpose of designing the investigation of clinical benefit, there is also not any discussion in the patent admitted by the experts that shows the public that the inventors used the EAE experiments, used some proportionality analysis for humans, and how they arrived at any of the doses that are listed in the investigation of clinical benefit, whether it be 0.5, 1.25, or 2.5 milligrams. None of those doses that are disclosed in the investigation of clinical benefit are tied back or explained or linked in any way in the specification to the rat experiment. The only testimony linking them is that the investigation of clinical benefit followed the rat experiment. But what it doesn't do is give the public or a person of ordinary skill, most importantly, any information about how the EAE experiments, really how or whether the EAE experiments related to the doses in the investigation of clinical benefit, particularly... He made specific findings, paragraphs 54, 55. He specifically said that he further found that a skilled artisan would understand that the rat model were good models for relapsing EAE. EAE was the dominant model for stuttering MS treatments. He then went on to say that they credited Novartis' experts to say that the skilled artisan would have converted the 0.3 milligram to the 0.5. And he went through the details of how that was done. I don't really understand your blanket statements that there's nothing there. I mean, he cited to a lot with respect to the 5 milligrams. Well, with respect to the testimony he cited, Your Honor, I think the point is that he cited essentially some direct testimony, but then did not address any of the admissions made by those same experts. For example, to use an example, in paragraph 56, the order cites Dr. Steinman describing the conversion, but Steinman admitted that that conversion is nowhere disclosed. Counsel, this is not an agency analysis. We're not supposed to analyze whether they cited every single thing that supported or didn't support their conclusion. Ultimately, the court has to make determinations and findings of fact, and they have to cite the support for those determinations. And we're supposed to assume that a trial court considers the totality of the evidence when it makes those decisions. So the mere fact that he doesn't cite to something doesn't mean that he didn't find it unpersuasive. Fair enough, Your Honor. The point isn't so much about what he cited. The point is that our brief sets out using the testimony of those same experts and argues that as a matter of law, the things that the district court, the purported evidence, the testimony from the experts that the district court relied upon, is insufficient as a matter of law to make the finding that he did. Well, you have to say his findings are clearly erroneous. Correct. And I think in our brief, we both say that he misapplied the legal standard, particularly in the other argument about absent an immediately preceding loading dose. We'll get to that in a minute. Yes, Your Honor. But for the 0.5 milligram argument, the point is that the testimony, and I'll just use an example of how we address that in the brief. In paragraph 56, the order cites Dr. Steinman as saying that a person of skill would have converted 0.3 to 0.042 in the rat study. But the evidence is that that's not in the patent. The evidence is that Dr. Steinman admitted that it wasn't in the patent, as did Drs. Lublin and Jusko. And the evidence is also, as it went in, that the calculations and the math that Novartis' experts explained, testified that they thought that this is how a person of ordinary skill would interpret it, is also contradicted by the inventors themselves, who conceded that their calculations were not only not in the patent, these calculations that they've come up with for the litigation were not even in the internal Novartis document describing their experiments. And that's in evidence as well, where the inventors were describing a conversion without any documentary evidence, but described a conversion process that was different than the ones that the experts testified that a person of ordinary skill would do. So you're just asking us to say that basically everything he said in paragraphs 52 through 59 that you disagree with, and that, yes, reasonable minds might be able to go either way, but our standard of review has to say, are his conclusions clearly erroneous? Understood, Your Honor. But clearly erroneous, and that's where we cite the Supreme Court's Gypsum case. Clearly erroneous does not mean that we have to establish that you are firmly convinced there was an error. And so this evidence that he cites, which all relies on the experts, admittedly is not in the patent. And our argument in the brief is that you cannot use the expert. As a matter of law, you cannot use the expert testimony that the district court used to fill the utter failures of disclosure. But you can use the expert testimony to explain what one of skill in the art would have known at the time. Yes, agreed. But where there is a complete absence, I mean, the patent doesn't even state... Counsel, why don't you answer that question quickly, but then I do want you to move on to your negative limitation issue, please. Yes, Your Honor. So the issue on the 0.5 milligram is that there is no disclosure in the specification. While the court can take testimony from a person of ordinary skill of how they would interpret the patent, they have to be interpreting something that is in the patent. There has to be some hook for them to say, here is what the skilled person would have understood as to why the inventors are in possession of 0.5 milligrams for human dosing. And that is where the testimony the district court relied on. Our argument is insufficient as a matter of law for that purpose in light of the record as a whole, including their admissions. I will move on to absence and immediate proceeding loading dose. For this argument, in the first instance, the district court did not cite or apply any of this court's precedent in applying Ariadne to negative claim limitations. And we are not arguing there is a heightened standard for negative claim limitation. The point is that the federal circuit has developed at least a narrow body of law with respect to negative claim limitations in this context because it wrestles with the notion of how do you describe a negative. And those cases apply Ariadne to do that. So it is not applying a heightened standard. It is taking Ariadne and saying in a situation where the issue is an exclusionary claim limitation, a negative claim limitation, those cases explain that there has to be something in the specification that supports the exclusion. This is Judge Lynn. The question in my mind is that since these are all really fact-based determinations, why is not the standard in Ariadne met in this case? The standard in Ariadne is not met in this case because there was no disclosure in the specification that the inventors possessed an invention which was to practice a method in the absence of an immediately proceeding loading dose. The patent office said that just practicing a method of 0.5 directed to RRMS is not patentable. It was rejected based on Novartis' earlier research into transplants using the same drug. It was rejected as obvious. In order to get the claims issued at all, Novartis first tried to argue that they didn't need to amend the claims and they tried to get around the obviousness rejection. And when it was maintained, they amended the claims. And what the patent office issued a claim on was an invention that cannot be infringed essentially if there is an immediately proceeding loading dose. And so that is what the claimed invention is. And there is no disclosure in the specification at all that shows that the inventors possessed an invention to omit, to forbid the taking of an immediately proceeding loading dose. And that doesn't satisfy it. But the patent does talk about a daily dose. It doesn't talk about anything in addition to the daily dose. Well, it does talk about it. There are findings relating to this issue. Agreed there are findings related to the issue. And it relies on initially and daily. And daily is not required. I mean, it's required by the claim. But the daily that is cited in the specification as purported support is one of several dosing regimens, including every other day, every third day, and weekly. And if daily excluded a loading dose, there wouldn't have needed to be a claim element, the claim amendment, because the claim says that it's daily administration. So Judge Jordan did go through a variety of facts that he said supported the absence of a loading dose. He found that loading doses were well-known in the art, and it was well-known that loading doses are higher than the dose ultimately given. He said that the application made clear that 0.5 was to be an initial dose, thereby indicating that no loading dose should proceed it. He found that it was clear from the application that the point of the study and prophetic application was to disclose the lowest human dose that could be efficacious. And finally, he said that the application did discuss alternative dosing regimens but never contemplated any higher dose than that chosen. And, you know, the point is we've got a really high level of skill in this art. Everybody knows what a loading dose is, especially those with that high level of skill. If there was a loading dose contemplated, it would have been disclosed. And so, you know, it's hard to prove a negative. I get that. But I don't think we have ever said that there's any one formula for how you establish the negative.  Agreed, Jaron. There's not one formula, but our argument is that all of the formulas that have been articulated by this court for satisfying a negative claim limitation are not satisfied here. The facts do not support any of the Santeris, Infy, or Nike recitations of what satisfies written description for a negative claim limitation. And I know that I'm over time, and so I'm happy to address that. Thank you, Mr. Stiermont. Let's hear from Ms. Love. Thank you, Your Honor. Thank you, Your Honor. May it please the court, Jane Love for Novartis. HEC has failed to carry its heavy burden to show clear error. Three different fact finders have analyzed written description. The PTAB in an IPR, Judge Stark in a preliminary injunction proceeding, and Judge Jordan in crime law. Counsel, do you agree that silence in the specification is not enough under our case law to support a negative limitation? That if the patent spec was completely silent, that our law makes it clear that that's not enough. No, Your Honor. Silence is in the ears of the beholder. Silence under area needs to be interpreted from the point of view of the person of skill. And here the court made factual findings that the person of skill reads the human example to convey the message that the daily dosage of 0.5 milligrams is given initially, excluding the possibility of a loading dose given the undisputed definition that a loading dose is a higher than daily dose given at the beginning of treatment. Just to be clear, because I'm kind of surprised at your answer, I thought that you would immediately say, yes, of course, if the spec was completely silent about something, but then you would go on to say, but this spec isn't silent. But instead you said silence can be okay, that we can find a negative claim limitation even when the spec is completely silent as to it? Your Honor, I guess the definition of silence is what's in question to the person of skill in the art. If the words are not on the page, so if we're talking about silence being no literal recitation of the words that you can read in the claim, if that's the definition of silence, then there still can be written description because the person of skill takes meaning from the whole specification in ways that a lay person will not. So just the binary question of yes or no, whether the words are on the page, isn't the test. So if you're the person of skill in the art, the fact finding is that a person of skill in the art would understand when the specification uses the word daily, like in column 15, that that excludes a loading dose. In that context, yes, Your Honor. The person of skill is looking at the dosing regimen in this particular art. So the use of the word daily excludes the loading dose, and that's how a skilled artisan would understand the inventor to have possessed this invention? The possession comes from the combination of the EAE example, which shows surprising results at very low doses of completely inhibiting relapses. Counsel, I'm focused on the loading dose. Focus on the loading dose. So the entire support for the loading dose comes from the word daily, correct? It's in the context of the whole patent, and in this case, the daily dosage in the example is given initially, which in combination, the findings below show that testimony looks at the proximity of the word initially and with the understanding that a loading dose is a higher-than-daily dose given at the beginning of treatment excludes the loading dose. Okay, so the word daily is what supports the no-loading-dose limitation. I understand your argument. Now, here's a question for you, though. Claim 1 contained the word daily. It already had the word daily in it. You added absent and immediately preceding loading-dose regime. So if the word daily already implied no loading dose, and I use that language because that's Judge Jordan's actual fact-finding, that the word daily plainly implies no loading dose. That is his Paragraph 64 or 63 fact-finding. So if the word daily said that, why did you have to then superfluously add absent a loading dose to the claim? Yes, Your Honor. During the examination, the examiner was reading the claims with the broadest reasonable interpretation and cited the covariate reference that my friend on the other side had mentioned. That's prior art about designing loading-dose regimens for transplant patients using different rates and ratios. The amendment was added to clarify that the claim does not overlap that covariate prior art reference. Really? Because I read the prosecution history, and it doesn't look like the amendment was added to clarify. Is there something in the prosecution history you can point me to that would suggest this is a clarifying amendment as opposed to an amendment to overcome obviousness? Dr. Simon reviewed the file history and testified at A3652 that he read the file history as the phrase being added to clarify the claim so that it wouldn't overlap with covariate. Counsel, isn't it more accurate to say that silence is a factor that can be considered if one of skill in the art would necessarily expect something to be there, but that it's not enough? In other words, Judge Jordan didn't say that mere silence was enough. He found that the other things that I pointed to were important to the conclusion that one of skill in the art would understand that a loading dose was excluded. Yes, Your Honor. Absolutely. I think the area test requires the whole patent to be taken into consideration against the backdrop of the prior art and the knowledge of the person of skill in A3652. Well, that was certainly a helpful and friendly question and an answer that really said nothing. How about you point to me the other parts of the patent that you say actually supported instead of just saying look at the whole patent? You pointed me to the word initially and the word daily. Is there something else in this patent that supports you apart from just generalities? The fact that the patent is about RRMS, it's a chronic condition, lifelong condition, where a person of skill would understand that a loading dose, which had been used in the prior art for transplant patients that had an acute condition, those patients would have needed a much higher kind of jump start loading dose at the beginning to help their body not reject the organ. RRMS is a different story where it's a chronic condition, and a person of skill in the art would know that, and the patent is all about multiple sclerosis. Also, a person of skill would know that singalamud, which is the focus of this patent. So just to be clear, none of this is in the patent. You're just saying a person of skill would know these things, but none of it. My question to you was, is there anything else in the patent other than the word initially and the word daily? And you've pointed me instead to other stuff, but nothing else in the patent. I just want to be really clear. There's nothing else in the patent, correct? Well, the RRMS field is in the patent everywhere, in the abstract, in the examples, and there was a finding, like at paragraph 52, in the decision. In terms of reading the patent as a whole, the person of skill is understanding that this is about RRMS based on the disclosure in the patent. So a person of skill would understand it's about RRMS, and that means is there something in the patent that suggests what that means, if this is about RRMS? Well, the patent itself is focused on the treatment for relapsing, remitting, multiple sclerosis. Just so I know, is that preamble a claim limitation efficacy? Do you have to, because you're telling me a person would know that, that would imply that this is a claim limitation. Is actually successfully treating RRMS, which is the preamble, a claim limitation? It is a claim limitation, Your Honor, that was construed at claim construction, but the construction is to have a treatment purpose, not efficacy, at hex urging, actually. Okay. So if I gave my child a placebo drug and said that the purpose of this drug is to cure your headache, that's good enough, right, because it's the purpose, but it doesn't actually have to do anything? Administering a placebo knowingly would not necessarily be a treatment purpose because the placebo itself. So we have to decide whether or not these claims are infringed based on whether or not somebody intended to be helpful, whether they were or not? There's a claim construction decision where Chief Judge Stark, at the time, did identify that the purpose in administering the drug was the factor. So the claim construction, just to be clear, in order for us to find in your favor, we have to accept the claim construction that if you intend to be helpful, if you intend to be treating RRMS, whether you do or not is irrelevant. It's just your intention. Well, the written description of the preamble wasn't on appeal. You're the one pointing to it and suggesting that a skilled artisan would utilize that in coming to the support for it. So I was assuming that it was part of this analysis. Is that not right? Well, Your Honor, the analysis looks at the fact that the whole context of the patent, the patent taken as a whole, is focused on a chronic condition, in this case a form of multiple sclerosis, because patients need to take this drug for the rest of their lives and there is no need to kickstart the amount in the body. A person of skill would understand that no loading dose would be associated with treating a multiple sclerosis disease. With respect to the fact that the preamble is limiting, both district court judges reached that conclusion, correct? Yes, Your Honor. And that's not an issue on appeal before us, correct? Yes, Your Honor, that's correct. And finally, a person of skill would also understand, bring to the reading of this patent the existence of a serious side effect called bradycardia. It's not in the patent per se, literally, but a person of skill looking at this patent covering fingolimod was a known drug. There's prior art about the drug that shows the first dose has an associated serious effect called bradycardia, slowing of the heart. And the physician, person of skill, would understand that. You would want to avoid that. Counsel, how do you square your argument in this case with Kappos? So, Your Honor, Kappos 2006 is an abstract. It does not include a key part of the story in the patent, which is the EAE animal model results. Just to be clear so we understand what Kappos discloses, it expressly says RRMS, correct? Yes, Your Honor. And it expressly says once daily, once daily, which seems even narrower than your daily, once daily. And yet Judge Jordan expressly held as a fact finding that this piece of prior art did not exclude a loading dose. It is an abstract, and the person of skill testified that it was unknown what other information would be associated with it. Wait, something was unknown? I thought you said a person of skill in the art would know with RRMS that you don't use loading doses. With Kappos 2006, it's a design of a clinical trial, and the design features would have been possibly not fully disclosed in that abstract because as an abstract, a person of skill would know that there were Is your disclosure a design for a clinical trial? Isn't your entire disclosure a prophetic example involving rats? No, Your Honor. Our disclosure is a combination of the whole patent, which includes a RRMS animal model, the EAE example, plus a prophetic clinical trial that includes the doses and the recitation of treatment, which a person of skill would understand to be a complete disclosure, whereas the Kappos 2006 abstract, a person of skill would know it's an incomplete disclosure. I have to be honest. I really don't understand what that means, it's an incomplete disclosure. Judge Jordan made a fact finding that this is directed to RRMS. He made a fact finding that it discloses once daily, and then he concluded, based on the expert testimony, that that did not exclude the possibility of a loading dose. But he did conclude, didn't he, that Kappos was just an abstract and was not written to fully disclose and that there are two different concepts here? That's correct, Your Honor. The patent as a whole would be expected by the person of skill to be complete, and the abstract by its nature would be known to a person of skill to be an incomplete document. Can you explain to me what the heck that means? Because I really don't understand. I understand an abstract is the summary of something, but he didn't find that a person of skill would know, because it's RRMS, and know, even though it says once daily, that that implies no loading dose. If that was what a skilled artisan would take away, then they would know the rest of the document would say that, right? But he found the opposite. How can daily have two different meanings, one meaning in Kappos and different meaning in your patent? Your Honor, I don't believe that daily would have two different meanings, but instead that the fact that it was an unknown additional information related to the abstract left the possibility that a loading dose still could have been included in the clinical trial design in Kappos 2006. Right, because the word daily didn't exclude that possibility, correct? Well, in that context, that's true. But the context of the patent is different, because a patent is presumed to be a complete disclosure of what the invention is. Counsel, my big concern is that I feel like what you're asking us for represents a dramatic extension or even a rejection of our Santoros decision. Negative limitations are hard, and really the patentee bears the burden of making clear to the public the scope of the invention it possesses. And you did nothing in this patent. You didn't include any information. You didn't include disadvantages. You didn't include alternatives. We have a bunch of cases that have analyzed different ways, and there are many different ways in which patentees have signaled to the public that their invention will not include this negative limitation, and your patent meets none of those. And, I mean, we never said those ways are the exclusive way of doing it, but your patent has no way of doing it. Your patent discloses nothing that is consistent with all of those different examples we've given of how you can successfully exclude or include a negative limitation and exclude something. And I'm really worried that you're asking us for what amounts to a dramatic change in the law of negative limitations. Well, Your Honor, I think the Nike case explains that there isn't a heightened standard for negative limitations, but even if there were, there were reasons to I agree there's no heightened standard. There has to be some disclosure. Well, in this case, there is disclosure in the fact that there's an undisputed definition of a loading dose, which is a higher dose at the beginning of treatment, and this patent clearly discloses in the human example, which reflects the claims that a daily dosage is given initially, and that is a reason for excluding the possibility of a loading dose. Ms. Love, one quick question before your time is out. In finding of Act 62, Judge Shorten says, quote, the prophetic trial tells a person of skill that on day one, treatment begins with a daily dose of 0.5 milligram, not a loading dose. Where would I find that in the patent? Well, Your Honor, that comes from a testimony from Dr. Steinman, who, and it's cited here, who was looking at a slide in the courtroom of that prophetic example and explaining how a person of skill would read that example. And he understood the word daily dosage to mean 0.5 milligrams given each day. And when it started initially, Dr. Steinman said, well, then a person of skill understands it's day one, you're giving treatment, which is the 0.5 milligram daily dose. So that's his understanding of the patent text in Column 11. Well, yes, Your Honor. It's the perspective of the person of skill's reading of that example, which is exactly carrying out the area test in understanding the patent disclosure. Okay. But there's nothing in the patent that says treatment begins with a daily dose. The prophetic example says treatment begins initially, and treatment is the 0.5 milligram daily dose. So if that begins initially, it excludes the possibility of a loading dose. Okay. To be clear, it doesn't say treatment begins initially. Column 11 says initially patients receive treatment for two to six months. What are you talking about? Where in the patent does it say what you just claimed it said? If it said that, this would be a different case. The interpretation by Dr. Steinman and other experts. So just to be clear, you think I can't read the words initially patients receive treatment for two to six months? You think an expert needs to tell me to interpret that differently than it's plain meaning and I should accept that? Well, Your Honor, I think when we're in the area of dosages of drugs that are being prescribed, there are aspects to how the physician would understand the description of the prescription to be different than a non-physician. And in this case, the person of skill included a multiple sclerosis physician. So as a matter of law, I construe this language. And the patent says initially patients receive treatment for two to six months. And you believe I should construe that as initially there is no loading dose? Yes, Your Honor. A loading dose is excluded from that treatment. One last thing. MPEP 217305. How, if I hold in this case what you wish me to hold, am I not inconsistent with that MPEP? Now, let me be clear. The MPEP is not binding law. And, of course, this court can decide whatever it wants. But the definition of how a negative limitation would be satisfied that you're asking for would certainly render that MPEP completely void and inaccurate. Am I wrong? Is there something I'm missing about your definition that would still allow that MPEP to have life? Well, Your Honor, the MPEP section allows for written description to be met when a claim limitation is expressly or implicitly supported. And here, as the court found, the negative limitation is plainly implied to the person of skill. So I think it would be still in concert with that section. Okay. So I want to ask you one last question, and then we'll let you sit down, and we'll let your present counsel have some rebuttal time. You told me that everyone would know that loading doses aren't used in MS treatment. Is that correct? Because you explained that it's sort of a long-term treatment and the word daily and all that other stuff. Is that right? Yes. It's true that a person of skill would believe that it's not a good idea to use a loading dose in an MS context. But then your expert testified that it happens, right? In rare instances, it can happen. So your expert testified that sometimes MS patients are treated with a loading dose first. The normal sort of baseline expectation? I think really it's a yes or no question. Did your expert testify that loading Mr. Lublin or Dr. Lublin, I'm not sure, did he testify that sometimes MS patients are treated first with a loading dose? In rare instances, Dr. Lublin did testify that that's true. Yes, Your Honor. Dr. Hoffman also testified that it's not a good idea to administer a loading dose to an MS patient. And there's fact-finding in paragraph 66 related to Dr. Hoffman's testimony as well. Okay. Thank you, counsel. Let's hear from Mr. Schiermont. I'm going to restore your rebuttal time, the full five minutes, because we went way over with Ms. Love. So, Mr. Schiermont, you can have your full five minutes of rebuttal. Thank you, Your Honor. I want to go right to the heart of the issue that was just part of the last colloquy, which is Dr. Steinman's testimony about daily that the district court relied on as kind of the hook. The formulation of Dr. Steinman's testimony was actually incorrect. Dr. Steinman testified that if one were going to use a loading dose, that a person of skill would expect that if a loading dose was going to be used, that it would be disclosed in the specification. And that's where he talked about the daily portion of the specification. But on cross-examination, and this is at appendix 23404 to 405 at transcript page 826, line 18 to line 27. And I asked him on cross, I said, you've analyzed this from the perspective of if there was going to be a loading dose, you would expect it here. But what we have is a negative claim limitation that a loading dose is forbidden, and I asked him, can you identify anything in the patent that the inventors were in possession of forbidding an immediately proceeding loading dose as an aspect of their invention? And he testified that if you're talking about the exact words, if that's what you mean by a textual hook, you have the claims and you have the specification, which I understand doesn't change, so you couldn't put a textual hook into something that doesn't change. That was his answer. Counsel, can I get back to basics again? So despite what Judge Moore said, written description is factual, not a question of law, right? Written description is a factual conclusion, right? Written description is a question of law, but isn't construing the claim or understanding what the specification teaches kind of part of a legal question? But the claim construction is not appealed, right? The claim construction is not appealed, but as we argued in our brief and with our citation to GIPSOM, the testimony can't contradict the document and the critical document here being the patent. But I just want to make sure that we understand that we're on the same page. We have to conclude that both Judge Stark, who interpreted the testimony, and the prophetic examples and prophetic application in one way with respect to the preliminary injunction, and Judge Jordan, who interpreted all of that the same way, that we have to conclude that they both committed clear error in order for you to prevail on this. And you're arguing that there's lots of testimony that goes the other way. I get that. But that's what we would have to find, right? Yes, and since judicial review of findings of the trial court does not have... Counsel, Judge Moore, you said yes to that. Did Judge Stark, I just want to make sure I understand because I don't remember all of these facts, but did Judge Stark actually hold that the word daily excluded a loading though? He's in the preliminary injunction context. I was hoping the lawyer might answer. Judge Stark's order is not on appeal, and I don't believe he made a finding that daily excludes a loading though. Well, if you can go back and look at his preliminary injunction order, he did. He said that the plaintiff was likely to prevail on that point. Right. He said plaintiff was likely to prevail on that record. But the point is that the court can reverse findings of facts that are clearly erroneous, and that happens when although there is evidence to support a finding, the reviewing court on the entire evidence is left with a conviction that a mistake has been made, and that's the Gibson case, the Supreme Court case that this court has applied, and that's also the case that in explaining that standard in reviewing a trial court's judgment also made the point that where there is testimony that plainly cannot be squared with documentary evidence, you can find clear error. Counsel, didn't Gibson actually say that you may give little weight to inconsistent expert testimony? So we would have to conclude that the expert testimony here was inconsistent on its face. Isn't that right? It is inconsistent with the patent. But that's not what Gibson said. What Gibson said is where the testimony itself is internally inconsistent, then you can give little weight to that. It doesn't say if it's inconsistent with a particular result. That's not what Gibson said. Gibson said where such testimony is in conflict with contemporary documents, we can give it little weight, particularly when the crucial issues involve mixed questions of law and fact. That's the quote from Gibson. And so the point is that there is clear error here. Counsel, let me ask one last question if you don't mind. Of course, if my colleagues have more, they're more than welcome to jump in. But my biggest concern about this case, which you heard me say clearly to opposing counsel, is that this really is a silence case. In fact, the word daily using RMM, RMM, RMM, I'm sorry. Let me start over. RRMS. I found myself in a stuttering pattern here. The RRMS, there is no disclosure anywhere in this specification of no loading dose despite expert testimony that loading doses are sometimes used to treat MS, despite a prior art reference, which also uses the word daily. In fact, it goes further. It says once daily. And that was concluded not to exclude a loading dose. And the patent never mentions the word loading dose anywhere in it. This feels like a silence case to me. It feels like a case that lines up really clearly with what we've already treated in cases like Santaris or Nike or others. And I'm just really worried that to conclude otherwise is going to dramatically expand what patentees are capable of achieving after the fact in negative limitations. Can you address that for me, please? Yes. I think that of this court's jurisprudence on negative claim limitations, none of them could be squared with finding the disclosure, what is disclosed here supports the negative claim limitation directed to a loading dose. And it goes beyond Dr. Lublin's testimony, which you cited, and Novartis' counsel admitted Dr. Lublin said that a person of skill would not imagine or understand that loading doses are often used in MS patients. Dr. Jusko, Novartis' expert, testified the same thing at Appendix 23475. And opposing counsel said he used the word rarely, but he didn't, did he? In his testimony, I see where he says rarely. I see where he says have you heard before of loading doses in trials of MS drugs? And he says it happens. That's right. And Dr. Jusko said that it went further and said that the skilled person would know that Fingolimod had already been studied in transplant patients and they gave loading doses. And he also said that even though now they're going to a very small dose, I could envision the possibility of starting with a loading dose because we know, and this is an uncontested fact on which all experts agreed, because we know Fingolimod has a very long half-life. Very typically, drugs with long half-lives, because they take so long to come to steady state, to an equilibrium, they're often given with loading doses. And that was his testimony. And so there is unanimity in admissions by Novartis' experts that the skilled person reading the 405 patent would come with it, given the knowledge that loading doses are often part of these kinds of methods. And so it was, in addition to Dr. Steinman, not being able to identify anything in the patent that is directed to the negative claim limitation as opposed to being directed to where you would expect to find something if there was going to be a loading dose. Counsel, I think that we are way out of time. Thank you very much. I think both counsel, this case is taken under submission.